Vernon LILES, Appellant,

v.

WINTERS INDEPENDENT SCHOOL DISTRICT, Appellee.

No. 10672.

Court of Civil Appeals of Texas.

Austin.

June 10, 1959.

Rehearing Denied June 24, 1959.

Clark, Reed & Clark, Dallas, for appellant.

Yates & Yates, Abilene, for appellee.

GRAY, Justice.

This appeal is from an order overruling appellant's plea of privilege.

Appellee, Winters Independent School District, filed this suit in Runnels County against M. E. McGuire, Aetna Casualty and Guaranty Company, David S. Castle, Jr., Loxit System, Inc., and appellant, Vernon Liles. The suit was for damages alleged to have resulted because of the defective construction or laying of a floor in a gymnasium building. E. M. McGuire was the contractor, Aetna Casualty and Surety Company was a surety on the contractor's performance bond, David S. Castle, Jr., was the architect, Loxit System, Inc., a Chicago corporation, was the manufacturer of a patented system for laying wooden floors which system was used by the contractor. Appellant was the sales representative for Loxit in Texas.

It was alleged that the specifications for the floor

"called for hard maple flooring laid on a concrete slab by means of what is known as the 'Loxit Floor System' or its equivalent."

and further that:

" * * * the Loxit System calls for wooden flooring to be held in place by metal clamps attached to metal strips which are bolted or bradded to an underlying concrete slab. The 'Loxit System' was actually used in the gymnasium floors."

It was further alleged that after the gymnasium was accepted that:

"the wooden flooring 'cupped up' on practically each board and in addition the wooden flooring broke loose from the concrete on large areas and continues to break loose from the concrete in other areas. Where it has broken loose it has created bulges or elevated places on the floor, creating a very uneven surface, so as greatly to detract from its usefulness for all athletic purposes for which it was intended."

Various acts of negligence were charged against the contractor and the architect and that:

"Defendant 'Loxit System Inc.' by written recommendations made to architects, builders and to the public held forth and represented that the 'Loxit System' was a system 'for beauty, permanence, maintenance easy installation.' That the 'floors can be laid tight'. That they are 'easy and quick to lay'. That the art of laying same can be mastered in a few minutes. That the tenor and purport of said printed literature was that the 'Loxit System' was easy and extremely simple to use. That said literature was read by plaintiffs agents and officials who believed and relied on same. In truth and in fact said system is not simple, and is not easy to learn. The boards cannot be laid tight. A great many collateral circumstances, such as the moisture content of the cement, the soil beneath, that of the atmosphere and the wood flooring and various other conditions are calculated to result in a defective floor. Defendant Loxit System knew said system was subject to all of said collateral contingencies when said representations were made.

"Defendant Liles individually and as the sales representative of Loxit System, Inc. was present during the laying of said floor. He recommended that the floor be put in 'tight' and stated it could not be too tight. The defendant McGuire followed his instructions and got the floor too tight which was a proximate cause of it breaking loose from the concrete slab. Defendant Castle knew of the tight construction of the floor but did nothing to prevent it."

Appellee prayed for a judgment for its damages against all defendants jointly and severally.

Appellant, Vernon Liles, filed his plea of privilege to be sued in Dallas County, the county of his residence. The plea was duly controverted and at a nonjury trial it was overruled. None of the other defendants filed pleas of privilege.

Only three witnesses testified at the trial: Appellant, appellee's school superintendent, James Nevins, and appellee's president. All witnesses agreed that the floor was in such a damaged state that it was not suitable for a gymnasium floor.

Appellant denied that he was present at the time the floor was laid and denied that he was present when the metal strips were installed on the concrete slab. He said that he was present at the job in company with the president of Loxit System, Inc., and that at that time the concrete slab had not been poured. He said at that time they talked to the contractor and another man he thought was appellee's superintendent; that he talked to McGuire or to his foreman about the manner in which the floor was to be laid, but did not recall what was said. He explained the system he sold as:

> "a system of laying wood flooring or planking to the concrete slab, eliminating squeaks, sub-flooring, and use only the floor as furnished by some one else, by some one other than Loxit. The Loxit System is a mechanical system consisting of a series of channels into which—these series of channels are anchored to a concrete slab, and then the flooring is laid on top of the concrete slab and held in place with clips, metal clips, that fit into the channel, in the C type channel."

He would neither deny nor affirm that he said the floor could not be laid too tight but said the only way to lay the floor is to lay it tight. He said he was called to Winters, that he looked at the floor and that it was in a damaged condition; that he examined the floor to determine what caused it to buckle and that the cause was that it was not laid properly and said:

> " * * * The metal strips that lay in this direction. I am going to repeat Mr. Nevin's direction because I am not certain. The metal strips running north and south. Unless those strips are accurate, directly to the concrete slab then the chances are the strips will

come up; and we make note of that all the way through the literature. Loxit makes note of that all the way through the literature, and what caused that trouble was the low spots in the slab which you are going to have some time. Nobody is perfect and nobody can lay a perfectly level slab. Loxit, of course, asks you to get one as level as is possible to do so. Then, the metal channels, being some 10 feet long, are shimmed up from the low spots. They are supposed to use longer studs to, to put shims into the slab. If you use the same size stud all the way obviously it is not going to hold, because you are going into material laid in between the concrete between the metal strips which we call grout, and that grout is, we put that grout in there to make the whole surface solid. If you pour the grout before you have placed your anchors you have to mark on the metal strips the depth where you have a void or a low spot so that you can know at that point to shoot down at, because after the grout is laid you don't know where the low spots and high spots are. You only anchor your channels at one end, or to the—or at each end, and shim in under where the low spots take place.

> "Q. Did you observe that condition at the Winters Independent School District gymnasium, bubbling? A. Where the floor was that we took up at that bubble, that first bubble that I saw there, the bubble I saw when I visited there, none of the studs were into the slab.

> "Q. They were not driven all the way down into the concrete? A. No. They were into the grout and that's all.

> "Q. And that is not of sufficient strength to hold the stud? A. No more than a shim is. No."

The provisions of the contract were in evidence and provided that the flooring

should be laid in strict accordance with the manufacturer's specifications which in part are:

"Usually in a Loxit-laid floor the floor boards will not stay tight singly and there is no reason why they should. Simply ease the floor boards up without driving them hard and do not abuse the flooring.

"Proceed in this manner until five or six boards have been laid. Then take a piece of flooring and drive up the five or six boards together. This will assure a good tight floor because the accumulated holding power of the clips will be such that the flooring that is driven up in this way will be tight and stay tight, only the last board or two giving way a little. These, of course, will be taken up in the next drive."

Appellee's superintendent testified that the flooring used in the gymnasium was No. 1 maple and supposedly the best that could be bought; that when the gymnasium was accepted the floor was smooth and in good condition; that within a few months the boards cupped up on the edges and has continued to get worse and that it is not now suitable for a gymnasium floor. He was asked and testified:

"I was under the impression, as I recall it, that the beauty of this floor was you can—they were told we couldn't drive them too tight, could flood them with water, indestructible and would take any type of abuse a normal floor would not and it stay put.

"Q. Did you hear Mr. Liles make any remarks about the, putting that floor in tight or how tight to put it in when talking to the foreman on that job? A. That was my understanding, it couldn't be too tight.

\*    \*    \*    \*    \*    \*

"Q. Talking about Liles. Did you hear Liles, is it your recollection Liles told the foreman it couldn't be laid too

tight? A. That was my recollection, sir.

"Q. Now, is this first part of the floor, did that cup up like the other part did? A. This one corner, as I recall, it wasn't driven as tight, and this being McGuire's first floor he said that he was waiting for instructions, and he had been told to drive it tight; and from about, I don't know the exact number of feet, I would say 10 or 12 feet toward the north, from there on, they began to tighten it, and from there on it cupped worse than it did, from there back.

"Q. In other words, the place where they put it tighter is the place it cupped the worst, is that right? A. That would be my diagnosis, not as a contractor or architect; that's my own personal—

\*    \*    \*    \*    \*    \*

"A. \* \* \* I would say that any floor laid too tight would be a mistake.

"Q. On what assumption do you make that statement? A. Only that wood, masonry, anything in a building needs room to expand.

"Q. You say that as a layman and not as an expert on wood floors, planking, anything else? A. Very definitely a layman."

He also said that temperature changes and water would cause wood to expand. He did not say that water was put on or got on the floor and did not testify as to any temperature change that the floor was subjected to. His only explanation of why the floor cupped up or buckled was his opinion that it was put in too tight which he explained by saying the first flooring put down did not cup up as bad as that put down afterwards and which was put down tighter and which he said cupped worse. This tightening of the floor he said was done at the instructions of appellant.

Appellee's president testified only to the damaged condition of the floor.

Appellee undertakes to sustain venue as to appellant in Runnels County on its allegations that: he was present during the laying of the floor; that he recommended that it be laid tight and could not be laid too tight which was negligence; that the contractor followed the instructions and laid the floor too tight which was a proximate cause of the floor breaking loose from the concrete slab and causing the damage.

Appellant does not allege that any of the defendants are residents of Runnels County and does not sue appellant as a party to a contract in writing. Exceptions 4 and 5. It then appears that if venue as to appellant is to be sustained in Runnels County it must be under exceptions 9a or 29a of Art. 1995, Vernon's Ann.Civ.St. Appellant and appellee so contend.

■ The trial court of course could accept the testimony of appellee's superintendent and disregard that of appellant. Thus he could find that appellant told McGuire or his foreman that the floor could not be laid "too tight." (This statement is interpreted as an instruction and not as a caution.) He could also find that the instruction was followed and that after the instruction the floor was laid tight. The result was that when the gymnasium was accepted "it was a beautiful floor, well finished; smooth." Within a few months after acceptance the boards cupped up on the edges and continued to get worse.

In searching the testimony of the superintendent for the cause for the cupping he said that the floor was laid too tight. However he said that the first part of the floor that was put down "wasn't driven as tight," from there on they began to tighten it and that the tightened floor "cupped worse than it did, from there back." Then since all of the floor cupped up to some extent the cause for the cupping applies to the floor first put down as well as to the floor

that was tightened. The witness said that the floor that was put down "too tight" would not have room to expand and said that water and a change of temperature would cause wood to expand but gave no evidence of the application of either to the floor. Thus if the floor expanded and such expansion caused it to cup up as the superintendent seems to say there is an absence of evidence to show the cause.

Appellant's testimony as to the condition of the floor found by him when he inspected it is not disputed and such evidence may be sufficient to raise a question of fact as to the cause of the conditions so found which the trial court evidently found to be a cause different from that stated by appellant. As we understand the superintendent's testimony it is that the floor was put in "too tight"; that it would be a mistake to put any floor in too tight on the assumption that it needs room to expand. The floor then must have expanded but the superintendent did not say so but only said that water, change of temperature or moisture would cause it to expand. However he did not testify that any one of these causes were present and caused the floor to expand.

■ In any event the most that the superintendent's testimony does is to raise a surmise or suspicion that the floor cupped up or buckled because of the conditions about which he testified. This amounts to no evidence and is not sufficient to discharge the burden resting on appellee. Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059. In order to establish venue in Runnels County under exception 9a, supra, it was necessary for appellee to prove by a preponderance of the evidence that appellant committed an act or omission of negligence in that county, and that such negligence was a proximate cause of appellee's damages.

■ We may assume without deciding that by a preponderance of the evidence it was shown that appellant committed some act or omission of negligence in Runnels

County. However we must hold that such negligence was not shown by a preponderance of the evidence to be a proximate cause of appellee's damages as is required by exception 9a, supra.

Venue as to appellant cannot be sustained in Runnels County under exception 7 on the ground that appellant made false representations to appellee because in any event it was alleged that the contractor and the architect, not appellee, relied thereon. See: Trinity Universal Ins. Co. v. Soliz, Tex.Civ.App., 241 S.W.2d 625.

If we say that this is a suit against Loxit, a foreign corporation, and that venue as to it is in Runnels County under exception 27 because the cause of action or a part thereof arose there, still venue as to appellant, Loxit's agent, would not also be fixed there because the agent of a disclosed principal is not a necessary party to a suit against the principal. Tarrant v. Walker, 140 Tex. 249, 166 S.W.2d 900; Rifkin v. Overbey, Tex.Civ.App., 171 S.W.2d 175, er. ref., w.m.

In Ladner v. Reliance Corporation, 156 Tex. 158, 293 S.W.2d 758, 764, the court said:

"Every person whose joinder is necessary to afford the plaintiff the full relief to which he is entitled in the suit which can thus be maintained in that county is a necessary party within the meaning of Subdivision 29a. Commonwealth Bank & Trust Co. v. Heid Bros., 122 Tex. 56, 52 S.W.2d 74; Pioneer Building & Loan Ass'n v. Gray [132 Tex. 509, 125 S.W.2d 284], supra; Union Bus Lines v. Byrd, 142 Tex. 257, 177 S.W.2d 774; Tarrant v. Walker, 140 Tex. 249, 166 S.W.2d 900; Ramey & Mathis [Inc.] v. Pitts, 149 Tex. 214, 230 S.W.2d 211; Clingingsmith v. Bond [150 Tex. 419, 241 S.W. 2d 616], supra."

Paraphrasing the further language of this authority, it then was necessary for appellee to establish that the joinder of appellant was necessary to enable it to obtain full and effective relief in its suit which it was entitled to maintain in Runnels County against the other defendants.

A great deal has been written on the meaning of necessary party as used in exception 29a. However the Supreme Court has consistently defined the term in substantially the language above used citing Commonwealth Bank & Trust Company v. Heid Bros. supra [122 Tex. 56, 52 S.W.2d 75], where it is said:

"A 'necessary party' to a suit, according to the general understanding of that term, is one who is so vitally interested in the subject-matter of the litigation that a valid decree cannot be rendered without his presence as a party."

The very most that can be said is that appellee's suit is against Loxit and appellant as joint tort feasors. In this event either is liable for the damages sustained and appellee "could have full satisfaction therefor by judgment and execution against either." Tarrant v. Walker supra [140 Tex. 249, 166 S.W.2d 902]. For the same reason it may be said that appellee can have full satisfaction by judgment and execution against the other defendants.

We hold that appellant is not a necessary party to appellee's suit in Runnels County. We further hold that the evidence is insufficient to sustain a finding that appellant was negligent. A breach of contract may be tortious. Montgomery Ward & Company v. Scharrenbeck, 146 Tex. 153, 204 S.W.2d 508.

The only evidence that it was negligence to lay the floor "too tight", except the fact that it cupped, was the testimony by appellee's superintendent that it was a mistake to lay any floor too tight. This testimony from one who did not profess to know anything about laying floors by the Loxit System is no evidence of negligence.

We reverse and remand the case rather than render judgment because we are of the opinion that the venue question has not been fully developed. Jackson v. Hall, 147 Tex. 245, 246, 214 S.W.2d 458.

Reversed and remanded.